O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| ANNE MCVICAR, et al.,<br><br>           Plaintiffs,<br><br>    vs.<br><br>GOODMAN GLOBAL, INC., et al.,<br><br>          Defendants. | Case No.: SA CV 13-1223-DOC (RNBx)<br><br>**ORDER DENYING PLAINTIFFS' MOTION TO CERTIFY CLASS [104] [111]; DENYING AS MOOT DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF PAUL J. SIKORSKY [149] [154]** |

Before the Court are (1) Plaintiffs' Motion to Certify Class ("Cert. Mot.") (Dkt. 104, Sealed Dkt. 111) and (2) Defendants' Motion to Exclude Opinions of Paul J. Sikorsky ("Mot. to Exclude") (Dkt. 149, Sealed Dkt. 154).

## I.   Background

Plaintiffs bring suit on behalf of themselves and similarly situated consumers, claiming that Defendants Goodman Global, Inc., Goodman Manufacturing Company, LP, and Goodman Company, LP (collectively, "Goodman") manufactured and sold air-conditioning systems with defective evaporator coils and condenser coils.[1] The gravamen of the Second Amended Class Action Complaint ("SAC") (Dkt. 74) is that Defendants "marketed and warranted to homeowners, builders, and contractors, including Plaintiffs and members of the class, that [] Goodman Air Conditioners were of superior quality and engineered and built to be long-lasting and reliable, even though Defendants had knowledge [] that the [systems] contained a common defect in the evaporator coils" which led the units to prematurely malfunction and leak refrigerant, rendering them incapable of cooling. *Id.* ¶¶ 4-6, 8. After several rounds of motions to dismiss, the remaining Plaintiffs are Rich Harlan ("Harlan") and Jeffrey and Andrea Gross ("the Grosses") (collectively, "Plaintiffs").

The SAC alleges the following facts, drawn from the Court's Order Granting in Part and Denying in Part Defendants' Motion to Dismiss the SAC (Dkt. 97):

### A. The Grosses

In December 2012, Jeffrey and Andrea Gross ("the Grosses") purchased a Goodman-manufactured heating and air conditioning unit from AC Unit Direct, LLP, through AC Unit Direct's website. *Id.* ¶ 104. The Grosses spent $2,976.00 on the unit. *Id.* The unit was installed in the Grosses' home in January 2013 by Mike Mechanical Heating and Air ("Mike Mechanical"). *Id.* ¶ 107.

---

[1] A defect with the condenser coil was not pled affirmatively in the SAC. This issue will be addressed below.

Prior to purchasing the Goodman-manufactured unit, the Grosses conducted research on available air conditioning units. *Id.* ¶ 105. During this research the Grosses saw, reviewed, and relied on Goodman's marketing materials and the representations contained therein, including: statements indicating that Goodman units meet the highest industry standards, that Goodman warranties were considered among the best in the industry, and that Goodman units would efficiently cool homes on even the hottest days of the year. *Id.* ¶¶ 48, 54, 105. The Grosses purchased a Goodman-manufactured unit in reliance on those representations. *Id.* ¶ 105. The Grosses believed the representations in Goodman's marketing materials to be true, and that belief led them to choose a Goodman-manufactured unit. *Id.* ¶ 106. But the SAC alleges that those statements contain material misrepresentations and omissions of material fact regarding the quality and durability of Goodman-manufactured heating and air conditioning units. *Id.*

When the Grosses attempted to turn on the Goodman-manufactured unit on in May 2013, it did not work properly. A technician from Mike Mechanical concluded on May 20, 2013 that the evaporator coil contained a leak that could not be repaired and that the coil needed to be replaced. *Id.* ¶ 108.[2] The Grosses tried to make a claim through the Goodman warranty program but were denied and told that the warranty protections were unavailable because they had purchased their unit through an online retailer. *Id.* ¶ 109.

The Grosses have expended $1,600 to replace the evaporator coil. *Id.* ¶ 110.

SAC Order (Dkt. 97) at 2-3.

---

[2] As noted in the parties' briefing, the Grosses have since clarified that there was no problem with their evaporator coil, and, instead, the expenses were incurred to fix the unit's *condenser* coil. The distinction between the evaporator and condenser coil, as is relevant to the Class and the Grosses individually, will be discussed later in this Order.

**B. Rich Harlan**

On January 31, 2008, Rich Harlan ("Harlan") instructed his contractor Erick Trejo to purchase a Goodman-manufactured heating and air conditioning unit on Harlan's behalf. *Id.* ¶ 112. The unit cost approximately $4,500.00. *Id.* The unit was installed in Harlan's home on or around that same date. *Id.* ¶ 116.

Before choosing a Goodman product, Harlan read and relied on Goodman's advertising materials, including the representations that the Grosses viewed. *See id.* ¶ 113. Relying on those representations, which allegedly contain material misrepresentations and omissions of material fact regarding the reliability of the Goodman-manufactured unit, Harlan chose a Goodman product. Harlan specifically relied on Goodman's representations that its product is of a superior quality and fitness and carries a superior warranty. *Id.* ¶ 114-115.

Harlan paid for a service contract with Bell Brothers Heating and Air ("Bell Brothers") in Sacramento to cover the repair and maintenance of his Goodman-manufactured unit. *Id.* ¶ 117. The contract was initiated in or around February 2013. *Id.* In or around May 2013, Harlan noticed that the Goodman unit was not performing up to his expectations and notified Bell Brothers, which sent a technician. *Id.* ¶ 118. The technician informed Harlan that the unit's refrigerant levels were low and needed to be replenished. *Id.* ¶ 119. The refrigerant was refilled under the service contract with Bell Brothers. *Id.* On March 21, 2014, a Bell Brothers technician performed a routine check on the unit, and informed Harlan that the unit was leaking refrigerant and again out of coolant. *Id.* ¶ 120. Harlan was told that the repair was not covered by his service contract and would cost approximately $1,200.00. *Id.* On April 8, 2014, repair technicians from Bell Brothers replaced Harlan's evaporator coil. *Id.* ¶ 121. The technicians

1    informed him that they would submit the defective coil through Goodman's

2    warranty program. *Id.* They submitted the coil later that month. *Id*. Harlan

3    has incurred out of pocket expenses to attempt to repair his Goodman Air

4    Conditioner. *Id.* ¶ 122.

5    SAC Order at 3-4.

6         **C. Class Allegations**

7         Goodman manufactures and sells air conditioners under the Amana and Goodman brand

8    names. *Id.* ¶¶ 23-24, 37.

9    They also designed, manufactured, marketed, and advertised those air

10    conditioners. *Id.* ¶ 44. With each air conditioner, Goodman provided an

11    express warranty, along with representing that the air conditioners were fit

12    for the ordinary purpose for which air conditioners are used and were free

13    from defects in materials and workmanship. *Id.* ¶ 45-46. The express

14    warranties provided that the air conditioners would be "free from defects in

15    materials and workmanship under normal use and maintenance" for periods

16    ranging from five to ten years. *Id.* ¶ 48. [] On its website, Goodman

17    represents that, "[w]hen you choose a Goodman brand, you can rest assured

18    that you'll receive a refreshingly affordable product that's covered by what

19    many consider to be the best product warranties in the heating and cooling

20    industry." *Id.* ¶ 47. Goodman has also advertised that "[e]ven on the hottest

21    days of the year, [consumers] can keep [their homes] cool and comfortable

22    while enjoying low energy costs with a high-efficiency Goodman brand air

23    conditioner," that "[consumers] will enjoy top quality, high-efficiency

24    cooling," and that Goodman "focused on the design, engineering, and

25    manufacture of dependable products that have helped millions and millions

26    of homeowners achieve reliable, high-quality, and affordable indoor

27    comfort." *Id.* ¶ 53.

28    SAC Order at 4-5.

Plaintiffs allege that Goodman had knowledge of the coil defects through customer complaints and warranty claims. *Id.* ¶¶ 66, 71, 72. Goodman also sent internal emails discussing problems with the coils, crafted design changes, and implemented programs to address problems with the coils. *Id.* ¶¶ 68-75.

### D. Air Conditioning Systems

Because it may be helpful for readers, the Court will review the general components of an air conditioning system as explained to the Court by the parties. A residential air conditioner is comprised of three primary components: (1) an evaporator coil; (2) a condenser coil; and (3) a compressor. The three components are connected in a hermetic system with a refrigerant, such as Freon. The two coils are the key components in removing heat form inside the home and exhausting it outside. The coils at issue in this care are made with small diameter copper tubes (called hairpins) and copper u-bends that are brazed[3] together in a continuous fashion so that refrigerant can pass through the coil to other components of the air conditioner. Sikorsky Decl. (Dkt. 104-3; Sealed Dkt. 112) ¶ 9.



*Figure 1: Air conditioning schematic. Sikorsky Decl. Ex. B*

---

[3] Brazing is a metal-joining process in which two or more metal items are joined together by melting and flowing a filler metal into the joint, the filler metal having a lower melting point than the adjoining metal.

### E.  Procedural History

Plaintiffs Anne and Archie McVicar filed a class action complaint in this Court on August 12, 2013 (Dkt. 1). Goodman filed a motion to dismiss on October 4, 2013 (Dkt. 10). On February 25, 2014, the Court granted in part and denied in part Goodman's motion (Dkt. 37), and ordered the parties to show cause why the McVicar action should not be consolidated with a related case (Dkt. 33). Plaintiffs filed a First Amended Complaint ("FAC"), consolidating the claims in the related action, on March 31, 2014, including the claims of the McVicars, Robert Farmer, the Grosses, and Rich Harlan (Dkt. 42). Goodman filed a motion to dismiss the FAC on April 30 (Dkt 48); a motion which the Court subsequently granted in part and denied in part (Dkt. 66). On September 12, 2014, Plaintiffs filed the SAC. Defendants moved to dismiss the SAC on October 3, 2014 (Dkt. 80). On November 13, 2014, the Court granted in part and denied in part Defendants' motion (Dkt. 97)

On January 30, 2015, Plaintiffs filed the instant Motion to Certify Class (Dkt. 104, Sealed Dkt. 111). Plaintiffs seek class certification of one class (the "Class"):

> All individuals and entities in the State of California that own real property on which one or more residential air conditioners manufactured with copper evaporator and/or condenser coils under the Goodman or Amana brand names was installed from July 1, 2006 to the present.

Cert. Mot. at 1. Plaintiffs request certification of the Class for: (1) violation of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750; (2) violation of the False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500; (3) violation of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200; (4) breach of implied warranty; and (5) violation of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301.

Defendants filed an opposition to the Certification Motion (Dkt. 145), along with the Motion to Exclude (Dkt. 149, Sealed Dkt. 154) on April 30, 2015. Plaintiffs opposed the motion to exclude on May 26, 2015 (Dkt. 163) and Defendants replied on June 1, 2015 (Dkt. 166). The Court rescheduled the hearing on that matter to align with the Motion for Class Certification (Dkt. 170). Plaintiffs filed their reply to the Certification Motion on June 30, 2015

(Dkt. 172). The parties subsequently stipulated to continue their hearing date, in order to allow for an additional round of briefing on the issue of damages. Defendants filed a sur-reply on August 5, 2015 (Dkt. 183), with Plaintiffs filing a *sur*-sur-reply on August 10, 2015 (Dkt. 184). A hearing on these matters was held on August 17, 2015 (Dkt. 189).

## II.    Legal Standard

Courts may certify a class action only if it satisfies all four requirements identified in Federal Rule of Civil Procedure 23(a). *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614 (1997). Rule 23(a) requires Plaintiffs to show the following: (1) the class is so "numerous" that joinder of all members individually is impracticable; (2) there are questions of law or fact "common" to the class; (3) the claims or defenses of the class representatives are "typical" of the claims or defenses of the class; and (4) the person representing the class is able to fairly and "adequately" protect the interests of all class members. Fed. R. Civ. P. 23(a). These requirements are commonly referred to as "numerosity," "commonality," "typicality," and "adequacy." *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL–CIO v. ConocoPhillips Co.,* 593 F.3d 802, 806 (9th Cir.2010).

After satisfying these four prerequisites, a party must also demonstrate compliance with one of the requirements under Rule 23(b). Here, Plaintiffs are seeking certification under Rule 23(b)(2) and (3), and must demonstrate that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole" or that common "questions of law or fact" predominate over questions affecting individual members and that a class action is a superior method "for fairly and efficiently adjudicating" the action. Fed. R. Civ. P. 23(b)(3).

The decision to grant or deny a motion for class certification is committed to the trial court's broad discretion. *Bateman v. American Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010). However, "Rule 23 does not set forth a mere pleading standard." *Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551 (2011). A party seeking class certification must affirmatively demonstrate compliance with Rule 23—that is, the party must be prepared to prove that there are *in fact* sufficiently numerous parties and common questions of law or fact. *Id.*

In resolving a class certification motion, it is inevitable that the Court will touch on the merits of a plaintiff's claims. *See Wal–Mart,* 131 S.Ct. at 2551–52 ("The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's causes of action.") (quoting *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 156 (1982)). But, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds,* 133 S.Ct. 1184, 1194–95 (2013). Accordingly, any merits consideration must be limited to those issues necessary to deciding class certification. *See id.* at 1195 ("Merits questions may be considered to the extent— but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."). "[W]hether class members could actually prevail on the merits of their claims is not a proper inquiry in determining the preliminary question of whether common questions exist." *Stockwell v. City & Cnty. of San Francisco*, 749 F.3d 1107, 1112 (9th Cir. 2014) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011)).

### III.    Class Certification Under Rule 23(a)

The Court will first address the prerequisites to class certification under Rule 23(a). Next, it will turn to the requirements of Rule 23(b).

#### A.  The Class is Ascertainable

Before establishing numerosity, commonality, typicality, and adequacy, "the party seeking class certification must demonstrate that an identifiable and ascertainable class exists." *Mazur v. eBay Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009). "A class definition should be precise, objective, and presently ascertainable," though "the class need not be so ascertainable that every potential member can be identified at the commencement of the action." *O'Connor v. Boeing N. Am., Inc.,* 184 F.R.D. 311, 319 (C.D.Cal.1998) (internal quotations omitted). "As long as the general outlines of the membership of the class are determinable at the outset of the litigation, a class will be deemed to exist." *Id.*

The Court is satisfied that Plaintiffs' Class is ascertainable in the strict sense that the membership could be determined through objective criterion.[4] As explained by Plaintiffs, warranty databases would provide information on those who submitted claims for leaking refrigerant since 2006. Ownership of a copper coil be determined from the serial/model number of a particular unit. What Plaintiffs wholly fail to address, however, as will be discussed below, is how to cull the class where it is readily apparent that a vast majority of class members never were exposed to the misleading representations or omissions. *McVicar v. Goodman Global, Inc.*, 1 F. Supp. 3d 1044, 1052 (C.D. Cal. 2014) ("Plaintiffs may predicate a fraud UCL claim on a defendant's omission, but they must show that 'had the omitted information been disclosed, one would have been aware of it and behaved differently.'" (quoting *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (1993))). This will be addressed in the predominance section.

As long as the class definition is sufficiently definite to identify putative class members, "the challenges entailed in the administration of this class are not so burdensome as to defeat certification." *Astiana v. Kashi Co.,* 291 F.R.D. 493, 500 (S.D.Cal.2013) (quoting *Ries v. Arizona Beverages USA LLC,* 287 F.R.D. 523, 536 (N.D.Cal.2012)). Thus, the Court will continue to address the other Rule 23(a) and (b) requirements.

### B.  Numerosity

Numerosity requires that the class be "so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). The prerequisite of numerosity is discharged if "the class

---

[4] Defendants attack the ascertainability of Plaintiffs' proposed class – namely, they assert that Plaintiffs' proposed class is overly broad for three reasons: (1) the class definition includes condenser coils, in addition to evaporator coils, which were not addressed in the SAC; (2) the failure rate of the evaporator coils in the class period fall below Plaintiffs' expert's own definition of a defect; and (3) Plaintiffs cannot establish the putative class members were all exposed to uniform advertising. Each of these issues are better addressed under the specific Rule 23(a) and (b) standards, in particular adequacy, typicality, and predominance. Therefore, the Court will not discuss the issues in depth here.

is so large that joinder of all members is impracticable." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

Goodman does not dispute that the Class satisfies the numerosity requirement, and Plaintiffs have presented evidence to confirm that the prerequisite is satisfied. According to Goodman's data, Goodman shipped a total of 150,019 copper evaporator coils into California during the proposed class period from 2006 to 2014. Mot. at 5; Sikorsky Decl. ¶ 17. Thus, the Court concludes the Class is so large that joinder is impracticable, satisfying the requirement for numerosity under Rule 23.

### C. Commonality

The "commonality" prerequisite mandates that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality requires that class members share a common claim and this claim is "capable of classwide resolution," meaning that determination of the claims' "truth or falsity will resolve an issue that is central to [the claims'] validity." *Wal-Mart*, 131 S. Ct. at 2551. Generally, claims arising under consumer protection statutes are well-suited for class certification. *See, e.g., Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *In re First Alliance Mortg. Co.*, 471 F.3d 977, 992 (9th Cir. 2006).

The requirements of Rule 23(a)(2) have "been construed permissively," and just one common question of law or fact will satisfy the rule. *See Ellis*, 657 F.3d at 981. "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon*, 150 F.3d at 1019. "The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion [predominance] requirements of Rule 23(b)(3)." *Id.*

Plaintiffs present the following common questions that will be resolved by this action, namely, whether:

> (1) Goodman's air conditioners have a propensity to leak refrigerant and prematurely fail;
>
> (2) Goodman knew that the air conditioners have a propensity to leak refrigerant due to formicary corrosion and prematurely fail;

(3) Goodman's omissions of the material fact that the air conditioners have a propensity to leak refrigerant due to formicary corrosion was likely to deceive a reasonable consumer;

(4) Plaintiffs and the rest of the Class are entitled to equitable relief, including but not limited to restitution; and

(5) as a result of Goodman's conduct, Plaintiffs have suffered damages and, if so, the proper amount thereof.

*See* Cert. Mot. at 16.

In support of their Motion, Plaintiffs present the declaration of Mr. Paul Sikorsky, a 30-year veteran of the heating, ventilation, and air conditioning (HVAC) industry, working primarily for one of Goodman's competitors, Trane Company. Sikorsky Decl. ¶ 5. In his declaration, Mr. Sikorsky provides an overview of the general function of an air conditioning system. *Id.* ¶¶ 8-11. He notes that evaporator and condenser coils should not typically fail during their ordinary use, because of the absence of moving parts. *Id.* ¶ 13. A coil that leaks refrigerant is defective, and will cause the air conditioner to fail. *Id.*

After reviewing Goodman documents regarding copper evaporator coils manufactured by Goodman from 2006 to 2014, Mr. Sikorsky concludes that the relatively high warranty claims rate is evidence of a defect in the design or manufacture of the product. *Id.* ¶18. In his experience, warranty claims rates exceeding 1% are excessive. *Id.* Mr. Sikorsky concludes that, due to the significant average time from installation to failure, most of the failures identified in the warranty claim information occurred as a result of a slowly progressing, degenerative process like formicary corrosion. *Id.* ¶ 19. Formicary, or ant-hill-like, corrosion is a corrosion process that occurs in copper, which forms tunnels or perforations in copper that wind and intersect, evocative of its namesake – the ant-hill. *Id.* ¶ 21. Formicary corrosion has been identified in the industry as a potential failure for copper coils in air conditioning systems for many years, and could be caused by either the operating environment (e.g., chemicals used in the home) or from the internal processes used by the HVAC manufacturer (e.g., chemicals used in the manufacture of coils, including some lubricants). *Id.* ¶¶ 20, 23. Mr. Sikorsky evaluated

two failed Goodman-manufactured coils "which revealed formicary corrosion as the cause of refrigerant leakage." *Id.* ¶ 26. He also inspected 25 Goodman coils, of which 21 presented a leak consistent with formicary corrosion. *Id.* ¶ 28.

Goodman implemented a number of attempts to fix the problems that presented with formicary corrosion, including applying polymer coating and increasing the wall thickness of the coils, but neither fixed the underlying problem. *Id.* ¶¶ 33-34. Eventually, Goodman switched to using all-aluminum evaporator coils. *Id.* ¶ 35. Plaintiffs also present significant documentary evidence of company knowledge of coil failures in several states, including Texas, Tennessee, and Louisiana.[5] *See* Mann Decl. (Dkt. 104-2) Exs. K-P.

Defendants assert that the common questions are not susceptible to common proof because the Class definition will include years and model types and units that do not meet the theory of defect proffered by Plaintiffs' expert. Plaintiffs' "theory of defect" is not as simplistic as Defendants present it to be. Plaintiffs assert that the copper coils were defective due to their tendency to develop formicary corrosion and fail prematurely due to a refrigerant leak. Although Mr. Sikorsky indicated that the warranty claims rate of 1% is indicative of a problem, a warranty claims rate of lower than that does not necessarily indicate an absence of a defect during that period.[6]

Even accepting Defendants' critiques of Mr. Sikorsky's conclusions, Defendants argument does not undermine the fact that there are common questions that are susceptible to common proof – specifically, Plaintiffs' evidence proposing that *all* the coils had a propensity to leak refrigerant due to formicary corrosion and prematurely fail—the "truth or falsity" of

---

[5] Exposure to moisture tends to be correlated with higher failure rates, which can "help explain the difference in warranty claim rates between a relatively arid state like California and a much more humid state such as Florida where warranty claims rates on Goodman copper evaporator coils are 5 to 10 times higher." Sikorsky Decl. ¶ 21.

[6] Defendants raise numerous problems with the science and methodology supporting Mr. Sikorsky's Declaration. *See* Mot. to Exclude. As explained below, even accepting Mr. Sikorsky's declaration in its entirety, certification of the Class is nonetheless inappropriate. The Motion to Exclude is therefore DENIED AS MOOT.

which "will resolve an issue that is central to [the claims'] validity." *See Wal-Mart*, 131 S. Ct. at 2551. "Because the claims of all prospective class members involve the same alleged defect [] found in [air conditioners] containing the same key components, they are susceptible to common proof sufficient to meet the commonality requirement of Rule 23(a)(2)." *See Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 474 (C.D. Cal. 2012) (citing *Keegan*, 284 F.R.D. at 522 )).

Under the permissive standard of Rule 23(a), the Court finds that Plaintiffs meet the commonality requirement.

### D. Typicality and Adequacy

A class representative's claims or defenses must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Courts assess typicality by determining whether the class representatives and the rest of the putative class have similar injuries and conduct. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). A class representative must also be able to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In determining adequacy, courts resolve two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

"[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon,* 976 F.2d at 508. Unique defenses can go to either the typicality or adequacy of class representatives. *Petrie v. Elec. Game Card, Inc.*, No. SACV100252DOCRNBX, 2015 WL 4608227, at *4 (C.D. Cal. July 31, 2015) (citing *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir. 1990)). Arguments regarding standing, or the lack of a claim, however, naturally precede the Rule 23 inquiry. *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003). "The issues of predominance, superiority, typicality, and other challenges to [a named plaintiff's] class representation need not be considered if she is not in the subject class." *Id.* Therefore, if a plaintiff lacks standing or has no claim "she cannot

represent others who may have such a claim, and her bid to serve as a class representative must fail." *Id.* (finding that plaintiff who did not have a claim could not serve as a class representative); *see also Turcios v. Carma Labs., Inc.*, 296 F.R.D. 638, 644 (C.D. Cal. 2014) (determining that the evidence before the court demonstrated that the named plaintiff lacked standing under the CLRA or UCL to bring claims on behalf of the class).

Defendants challenge the typically and adequacy of Harlan and the Grosses, asserting that "they have no individual standing or claim." Opp'n at 14.

The Court addresses each one in turn.

### 1.    Rich Harlan

Defendant asserts that Rich Harlan does not have standing to bring his claim because he never actually relied on actionably misleading materials nor omissions. Mr. Harlan testified that he relied on representations that "Goodman units are built to last," which the Court has held to be non-actionable puffery. He also states that he relied on omissions from marketing materials regarding the coils propensity to fail. However, Defendants point out that Harlan believed that the coils failed 80% of the time, and stated in his deposition that if "the evaporator coils didn't fail 98 to 99 percent of the time," he would consider the product reliable. Harlan Dep. 130:3-8. Therefore, Defendants argue, had they disclosed that up to 2% of evaporator would leak because of formicary corrosion, Harlan would not have altered his purchase decision, meaning he incurred no injury as a result of the alleged omissions. Opp'n at 15.

While Defendants' evidence is compelling, it does not conclusively establish here that Harlan lacks standing. Defendants' deposition questions do not finally determine that, had Harlan known the exact specifics of the product defect he would still have made his purchase. *See Jordan v. Los Angeles Cnty.*, 669 F.2d 1311, 1321 (9th Cir.) *cert. granted, judgment vacated on other grounds*, 459 U.S. 810 (1982) ("[T]he class representative need not demonstrate a likelihood of success on the merits in order to maintain a class action."); *Tait*, 289 F.R.D. at 487 ("It is well established that a plaintiff's purported likelihood to lose on the merits is an impermissible basis for denying class certification."). Therefore, while Plaintiffs face an uphill battle in proving reliance, the Court will not resolve that inquiry here.

At this juncture, Harlan has standing and is an adequate representative. Nevertheless, Defendants' proffered evidence regarding Harlan's response to information regarding the failure rate of the products is salient to the Courts assessment of materiality, discussed below.

### 2.    The Grosses

Defendants argue the Grosses have no claim because the Grosses now admit that they never had a problem with their evaporator coil. Instead, they experienced a problem solely with their condenser coil. The court has previously ruled that, because the SAC contains only factual allegations regarding the evaporator coil, claims involving the *condenser* coil fail because those were never alleged to be defective. *See* SAC Order at 9-10, 13-14, 19, 22. When the Court ruled upon the prior Motion to Dismiss resolving the McVicars' claims, it looked to the SAC to determine whether Plaintiffs had alleged a defect in the condenser coil, such that harm caused by the condenser coil could be fairly attributed to the defective condition alleged in the SAC. SAC Order at 10. It found that it could not, and therefore the McVicars lacked "standing" to bring the claims, and had otherwise failed to state a claim. *Id.* In their moving papers, Plaintiffs do not address the Court's previous ruling on the condenser coil. They impliedly argue that because the Grosses were harmed by defective copper coils, the misstatement in the SAC – that they were harmed by defective evaporator coils, rather than condenser coils – is irrelevant.

The Court agrees with Defendants. The SAC does not allege a defect in condenser coils. The products perform different functions, and, therefore, are subject to different failure rates. Sikorsky Decl. ¶ 21. It is improper to simply broaden the scope of the litigation at this stage, where no defect as to the condenser coil has ever been adequately alleged or demonstrated. Therefore, like the McVicars, the Grosses have not alleged that they were harmed by the alleged defect that is the subject of this suit. The Grosses lack standing on this basis.[7]

The Court will also reach Defendants other arguments. Defendants contend the Grosses lack standing under the UCL, FAL, and CLRA because they cannot prove that their economic injury was caused by the unfair business practice or false advertising that serves as the basis of

---

[7] The Class definition is also unduly broad for this reason.

their claim. To support this contention, Defendants point to the fact that the Grosses admitted in deposition that they did not review any Goodman marketing or warranty materials before purchasing their air conditioning unit, outside of one website. Opp'n at 14. The argument lacks merit because Jeffrey Gross testified that he reviewed Goodman marketing materials on the RouteAC.com web site. Gross Dep. 44:2-9. Defendants have not established how those materials differed from any other Goodman marketing materials.

Defendants assert that, as to the MMWA claims, because the Grosses admit they did not rely on the manufacturers' advertising, and they lack privity with the seller (Goodman), their MMWA claim fails. Opp'n at 16, FAC Order at 16. As noted above, Defendants arguments regarding the merits of Plaintiffs' claim are not properly resolved here. Defendants do not argue that this defense would be unique to Plaintiffs, instead asserting that the evidence establishes a lack of reliance on Defendants' representations. For the same reasons as above, the Court concludes that there is still evidence to support the fact that Mr. Gross relied on Defendants' misrepresentations, supporting an MMWA claim even in the absence of vertical privity.

Finally, Defendants assert that the Grosses' damages are atypical because they are only seeking to recover the cost of purchasing from their mechanic a replacement condenser coil, but the part was provided to their mechanic free of charge. Defendants argue that the Grosses' injury (paying for the condenser coil) was caused by their mechanic, not Goodman. The Court does not see how this argument is unique to Plaintiffs, so as to render them atypical. *Negrete v. Allianz Life Ins. Co. of N. Am.*, 287 F.R.D. 590, 604 (C.D. Cal. 2012) (where multiple potential class member claims are potentially subject to these same legal defenses as the named plaintiff, and names plaintiff was not necessarily atypical representatives). However, the Grosses are nevertheless not sufficient representatives for the reasons above.

### 3.     Other Findings

Harlan is otherwise an adequate representative who has vigorously litigated the case and taken his obligation to the Class seriously. Harlan Decl. ¶ 3-4. Plaintiffs' counsel is also adequate. To be adequate, plaintiffs' counsel must be qualified, experienced, and generally able to conduct the proposed litigation. *See Lerwill* v. *Inflight Motion Pictures, Inc.*, 582 F.2d 507,

512 (9th Cir. 1978). Plaintiffs have retained qualified counsel who have previously been found adequate by this Court, *see* Mann Decl. Ex. RR, and the Court sees no reason to change that conclusion.

In sum, the Court finds that both Plaintiffs' counsel and Harlan will continue to adequately represent the Class.

The Grosses have admitted that there is an error in the SAC, and it is now apparent that they have not alleged any damage as a result of the defect at issue in the this case, faulty evaporator coils. Therefore, they are not adequate or typical representatives.

### 4.    Conclusion

The Court finds that Harlan is an adequate and typical representative under Rule 23(a).

## IV.    Class Certification under Rule 23(b)

Once Plaintiffs have satisfied the requirements of Rule 23(a), the proposed class must also satisfy at least one of the three requirements listed in Rule 23(b). The Court has concluded that Plaintiffs satisfied the prerequisites of Rule 23(a). Therefore, the Court now turns to Rule 23(b). Specifically, Plaintiffs invoke Rule 23(b)(3), under which common questions of law or fact must predominate and the class device must offer a superior means of resolving the dispute. They also invoke Rule 23(b)(2), under which class treatment is appropriate if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

### A.  Rule 23(b)(3)

### 1.    Predominance

"Rule 23(b)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend,* 133 S. Ct. 1426, 1432 (2013). Rule 23(b) requires that courts "take a 'close look' at whether common questions predominate over individual ones." *Id.* The predominance inquiry "tests whether proposed class actions are sufficiently cohesive to warrant adjudication by representation." *Anchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997).

However, predominance is also "readily met in certain cases alleging consumer . . . fraud," *id.* at 625; *In re First Alliance Mortg. Co.*, 471 F.3d 977, 992 (9th Cir. 2006).

Here, Plaintiffs suggest that the central predominating questions are the same as the common issues under 23(a), namely whether:

(1) Goodman's air conditioners have a propensity to leak refrigerant and prematurely fail;

(2) Goodman knew that the air conditioners have a propensity to leak refrigerant due to formicary corrosion and prematurely fail;

(3) Goodman's omissions of the material fact that the air conditioners have a propensity to leak refrigerant due to formicary corrosion was likely to deceive a reasonable consumer;

(4) Plaintiffs and the rest of the Class are entitled to equitable relief, including but not limited to restitution; and,

(5) As a result of Goodman's conduct, Plaintiffs have suffered damages, and the proper amount thereof.

Having considered the issues closely, the Court concludes that the common questions in this case do not predominate over the many individual questions. While there is a common question as to whether the air conditioners are defective and Goodman knew it, individualized questions regarding exposure to representations, materiality, and damages would overwhelm class litigation, in the case of the UCL, FAL, and CLRA claims, and individual issues regarding device failure would overwhelm any warranty claims.

### a.  False Advertising/Unfair Competition

Plaintiffs seek to certify a class based on claims of the Class for violation of California's UCL, FAL, and CLRA.

California's UCL, "FAL and CLRA rely on the same objective test, that is, whether 'members of the public are likely to be deceived.'" *Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 532 (C.D. Cal. 2011) (quoting *In re Tobacco II Cases,* 46 Cal. 4th 298, 312 (2009); *see also Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011) (holding that, under

CLRA, "[c]ausation, on a classwide basis, may be established by *materiality*," meaning that "[i]f the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class"). Generally, this objective test renders claims under the UCL, FAL, and CLRA ideal for class certification because they will not require the court to investigate "class members' individual interaction with the product." *Bruno*, 280 F.R.D. at 535; *Yumul v. Smart Balance, Inc.,* 733 F. Supp. 2d 1117, 1125 (C.D. Cal. 2010) ("California courts have held that reasonable reliance is not an element of claims under the UCL, FAL, and CLRA."). For this reason, district courts in California routinely certify consumer class actions arising from alleged violations of the CLRA, FAL, and UCL. *See, e.g.*, *Keegan*, 284 F.R.D. at 522 (certifying a California UCL/CLRA class of purchasers of vehicles); *Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 375–80 (N.D.Cal.2010) (Walker, J.) (certifying class under California's CLRA and UCL); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 589 (C.D. Cal.2008) (same).

### i. Exposure to Misrepresentations or Omissions

Class certification in a UCL, FAL, and CLRA case is inappropriate where Plaintiffs cannot show that members of the class were exposed to the same misrepresentations or any omissions, for example, through a long-term advertising campaign or where the misrepresentations or nondisclosures were included (or would have been included) on the product itself. *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012) ("A presumption of reliance does not arise when class members were exposed to quite disparate information from various representatives of the defendant.") (quoting *Stearns*, 655 F.3d at 1020); *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 455 (S.D. Cal. 2014); *Moheb v. Nutramax Labs. Inc.*, No. CV 12-3633-JFW JCX, 2012 WL 6951904, at *4 (C.D. Cal. Sept. 4, 2012) (declining to certify class for misleading representations under FAL, CLRA, and UCL because some of the members of the class never saw or relied upon defendant's alleged misrepresentation regarding the drug at issue). In a case alleging fraudulent omissions, there must be some method to conclude that there was exposure of *some* materials containing representations to the class, in order to establish that "had the omitted information been

disclosed, one would have been aware of it and behaved differently." *Mirkin,* 5 Cal. 4th at 1093; *see also Daniel v. Ford Motor Co.*, No. CIV. 2:11-02890 WBS, 2013 WL 2474934, at *4 (E.D. Cal. June 7, 2013) (at the pleading stage, "even where, as here, a plaintiff bases his claim not on an omission from a specific advertising campaign or brochure, but on a defendant's total failure to disclose the material fact in any way, the plaintiff's claim must fail when he never viewed a website, advertisement, or other material that could plausibly contain the allegedly omitted fact"); *Ehrlich v. BMW of N. A., LLC,* 801 F. Supp. 2d 908, 919–920 (C.D. Cal. 2010) (pleading failed because plaintiff did not allege reliance on any marketing materials, although noting that "[g]iven the alleged importance of the cracking defect, had BMW chosen to disclose it to prospective buyers, presumably [the p]laintiff, as a member of the buying public, would have become aware of the defect in the course of making his purchasing decision").

In some cases, for example, those involving automobile safety, it is fair to assume that *all* of the purchasers of automobiles read some marketing materials regarding the product, sufficient to conclude "that Defendants' conduct [in omitting information] was 'likely to deceive' members of the public." *Keegan*, 284 F.R.D. at 533 (citing *Plascencia v. Lending 1st Mortgage, LLC*, 259 F.R.D. 437, 448 (N.D. Cal. 2009)). The same goes for cases involving extensive and long running advertising campaigns, such as in the tobacco industry. In *Tobacco II*, the class was composed of individuals who had unquestionably been exposed to the defendants' ubiquitous marketing and advertising activities and certification was appropriate. *In re Tobacco II Cases*, 46 Cal. 4th 298, 320 (2009). However, "*Tobacco II* does not stand for the proposition that a consumer who was never exposed to an alleged false or misleading advertising or promotional campaign is entitled to restitution." *Pfizer Inc. v. Superior Court*, 182 Cal. App. 4th 622, 632 (2010).

Here, there is evidence that a majority of the proposed class never encountered any marketing materials regarding the product that they were going to purchase or already owned.[8]

---

[8] Dr. Robert Klein, an expert in applied marketing, was retained by Defendants to design and conduct a survey to measure the decision making and research behavior of potential class member. Klein Decl. (Dkt. 145-2) ¶ 10. Based on his research, he

*Cohen v. DIRECTV, Inc.*, 178 Cal. App. 4th 966, 979 (2009) (common issues did not predominate where the class would include subscribers who never saw [allegedly misleading] advertisements or representations of any kind before deciding to purchase the company's services); *cf. Stearns*, 655 F.3d at 1020 ("We do not, of course, suggest that predominance would be shown in every California UCL case. For example, it might well be that there was no cohesion among the members because they were exposed to quite disparate information from various representatives of the defendant.").

This case is different from cases like *Tobacco II* and *Keegan* where all class members may be presumed to have been exposed to some type of representations. This case is more like *Cohen*, where many members of the proposed class "who never saw [] advertisements or representations of any kind before deciding to purchase the company's" product would have been swept into the class definition. *Cohen*, 178 Cal. App. 4th at 979.

Granting class certification is inappropriate in this case where Defendants have proffered overwhelming evidence that owners of the subject air conditioners were not exposed to the alleged misrepresentation and omissions for myriad reasons: (1) many members of the class never purchased the air conditioners, and instead, purchased real property already containing one; (2) Goodman markets its air conditioners almost exclusively to contractors, meaning representations are unlikely to have been made to the consumers; and (3) most putative class members did not view any brochures or websites which allegedly contained the misleading material prior to purchasing an air conditioner. Therefore, the Court finds that the class definition lacks "cohesion."

Plaintiffs have not disputed Defendants' evidence regarding the exposure to representations in any meaningful way. Nor have they proposed any method for culling the class

---

concludes that only 27% of the consumers he surveyed reviewed manufacturers' brochures or websites when selecting the brand of their air conditioning or a major replacement part. *Id.* ¶ 11. Another 30% indicated that they had no involvement in any decisions regarding the selection or replacement of their central air conditioning system. *Id.* These results did not differ significantly depending on brand. *Id.* ¶ 12.

to resolve these issues. For the reasons set forth above, individual questions regarding class cohesion, specifically whether putative class members were exposed to any alleged misrepresentations or marketing materials omitting material information predominate over any allegedly common issues of a defect or knowledge thereof. Class certification under Rule 23(b)(3) as to these claims is inappropriate on this basis alone.

### ii. Materiality as to the CLRA Claims

Defendants argue that the issue of materiality is subject to individualized proof, and therefore, common issues do not predominate.

The Ninth Circuit has recognized that, as to CLRA claims, "[i]f the misrepresentation or omission is not material as to all class members, the issue of reliance 'would vary from consumer to consumer' and the class should not be certified." *Stearns*, 655 F.3d at 1022-23 (citing *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 129 (2009)). The materiality provision "requires that plaintiffs in a CLRA action show not only that a defendant's conduct was deceptive but that the deception caused them harm." *Massachusetts Mut. Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1292 (2002).

> That the defendant can establish a lack of causation as to a handful of class members does not necessarily render the issue of causation an individual, rather than a common, one. Plaintiffs may satisfy their burden of showing causation as to each by showing materiality as to all. In contrast, however, if the issue of materiality or reliance is a matter that would vary from consumer to consumer, the issue is not subject to common proof, and the action is properly not certified as a class action.

*In re Vioxx Class Cases*, 180 Cal. App. 4th at 129 (citations omitted).

Defendants have present a consumer survey showing that consumers would not have changed their behavior if they had been confronted with a disclosure regarding the propensity

of the coils to leak refrigerant.[9] Simonson Decl. ¶ 93. In addition, Harlan himself testified that if he had known that the evaporator coils failed only 1-2 % of the time, he would consider the product reliable. While not determinative of Harlan's typicality or adequacy at this stage of the litigation, such testimony in addition to the survey provide strong evidence that the question of materiality of the defect at issue is subject to individualized proof.

Plaintiffs appear to argue, unconvincingly, that no member of the putative class would have purchased a Goodman air conditioning unit with a copper coil if they had known about the formicary corrosion issue. Plaintiffs, however, have failed to proffer any proof as to that issue beyond the declarations of the named plaintiffs (two of which must now be disregarded), and the Court does not agree that it is a fair assumption to make in this case. Even accepting Plaintiffs' experts' conclusions regarding the existence of a defect due to the "high" warranty rate of approximately 1%, Plaintiffs have not shown that consumers would uniformly find any alleged "defect" material to their purchase decision. Plaintiffs Reply does not even substantively engage this issue.

-----

[9] Dr. Itamar Simonson, a consumer behavior expert, was retained by Defendants to provide his opinion on consumer behavior and decision making issues. Simonson Decl. (Dkt. 147) ¶ 9. Dr. Simonson opines that an increase in copper evaporator coil warranty claim rates during certain years is a poor indicator of failure due to formicary corrosion, despite Goodman's apparent internal response to the issue. *Id.* ¶¶ 35, 97-100 ("[W]hen the perception of a problem emerged, whether or not there is a founded basis for the perception, Goodman attempted to address the complaints.").

The bulk of Dr. Simonson's lengthy declaration is devoted to the consumer survey he conducted, testing individuals' response to a proposed disclosure to potential consumers regarding the propensity of coils to prematurely fail. *Id.* ¶¶ 45-96. Although he starts by noting that most air conditioning purchasers do not review *any* brochure or website prior to making a purchasing decision, an issue discussed above, he concludes from his study that, when consumers were confronted with a "disclaimer" regarding the propensity of copper coils to leak due to formicary corrosion, such a disclosure was immaterial to their purchase decision. *Id.* ¶¶ 93-96, 102. Specifically, 10% in the control group (no disclosure) as compared to 14% in the test group (disclosure) said that they would "probably" or "definitely" not buy the unit, a difference that Dr. Simonson concludes is not statistically significant. *Id.* ¶ 81.

In oral arguments, Plaintiffs cited to two cases for the proposition that class certification may be appropriate even where a defect never manifested: *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1173 (9th Cir. 2010) and *Baker v. Microsoft Corp.*, No. 12-35946, 2015 WL 4393964, at *6 (9th Cir. July 20, 2015). In *Wolin* the Ninth Circuit held that the district court erred when it concluded, without discussion, that certification is inappropriate because the plaintiffs did not prove that the defect manifested in a majority of the class's vehicles. In that case, the district court decided not to certify a class because appellants failed to prove that their tires wore prematurely due to a defect. 617 F.3d at 1173. This conclusion contradicted the Ninth Circuit standard, which provides that "proof of the manifestation of a defect is not a prerequisite to class certification." *Id.* (quoting *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir.1975) ("[N]either the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies the Rule."). Similarly in *Baker*, addressing express and implied warranty claims in an Xbox disc system, the Ninth Circuit again reiterated that proof of manifestation of a defect is not necessary to maintain a claim. Both these cases support Plaintiff's contention that, at this stage, they do not need to establish that a particular percentage of the products failed.

However, the Ninth Circuit has acknowledged the danger of *per se* class certification of defect claims. For example, as to *Wolin*, the Ninth Circuit "did not adopt a *per se* rule requiring class certification of defect claims…. Rather than adopting a *per se* rule, [it] simply rejected Land Rover's suggestion that [it] should categorically decline to certify classes in automobile defect cases." *Id.* at *7. Similarly, in *Baker*, it noted "plaintiffs in this case never moved for class certification. Instead, the district court [had] erroneously ruled that defect allegations are not amenable to resolution on a class-wide basis and struck the class allegations from the complaint" and therefore the Ninth Circuit did not reach the merits of several class certification arguments under Rule 23. *Id.* ("the district court's application of comity was misplaced means that these arguments are better addressed if and when plaintiffs move for class certification").

Thus, contrary to Plaintiff's implicit suggestion, not *all* product defect cases must be certified. The Court is decidedly not engaging in an inquiry of the merits of Plaintiffs' claims beyond what is minimally necessary to determine whether this class is certifiable. The uniform materiality of the alleged defect has been drawn into question by survey evidence and the deposition of the only remaining class representative, Harlan. Harlan Dep. 76:9-25 (Reisman Decl. (Dkt. 148) Ex. B). While not conclusively resolving Harlan's standing to bring the claim, evidence such as this is compelling that the materiality of the alleged defect will vary broadly between consumers, rendering certification of the CLRA claim inappropriate for this independent reason.[10]

Thus, the Court finds that, at least as to the CLRA claims, Defendants have demonstrated that the materiality of an alleged defect in Defendants' evaporator coils would vary from consumer to consumer, providing another reason why individual issues would overwhelm any class-wide ones.

### b. Conclusion

In sum, the Court concludes that Plaintiffs have not shown that common questions predominate regarding the FAL, UCL, and CLRA claims. Individualized questions regarding materiality as to the CLRA claim and exposure to the alleged representations as to all claims predominate over common issues – such as the defectiveness of the product or Defendants' alleged knowledge of a defect.

---

[10] The Court is sensitive to the fact that for the UCL and FAL claims, the court cannot consider issues of individual reliance and damages, because "the California UCL imposes an objective test that requires a plaintiff only to show that members of the public are likely to be deceived by defendant's representations about its product." *Bruno*, 280 F.R.D. at 531. However, this does not control the outcome as to the CLRA claim – the only claim of the three supporting damages. *See Anunziato v. eMachines, Inc.*, 402 F. Supp. 2d 1133, 1137 (C.D. Cal. 2005). The UCL and FAL claims fail independently for the reasons set forth above.

### c.  Implied Warranty Claims and Magnuson-Moss Claims

Plaintiffs also seek to certify the Class for violations of the implied warranty of merchantability as well as a derivative federal claim under the MMWA. *See* Mot. at 3. The Court's previous Order established that, for the implied warranty claims to continue, Plaintiffs had to establish that the defect actually manifested, and did so within one year. FAC Order (Dkt. 66) at 17. Individual issues abound as to this claim – two most notably: when the air conditioner failed and whether formicary corrosion (the defect) in fact caused the failure. Any common questions presented by the defect itself are subsumed in these individualized, fact-intensive questions. Further, a vast majority of the proposed class members would have no viable warranty claim, because they would never experience a product failure. Thus, the Court concludes that Plaintiffs have not shown that common questions predominate regarding the implied warranty and MMWA claims.

### d.  Damages Model

A final but essential reason that these claims cannot proceed on a class basis is that Plaintiffs have failed to produce any plausible class-wide damages theory. At the class certification stage, Plaintiffs must present a theory that can measure, on a class-wide basis, damages attributable to Plaintiffs' theory of liability. *Comcast*, 133 S. Ct. at 1433; *see also Chavez*, 268 F.R.D. at 379 ("At class certification, plaintiff must present a likely method for determining class damages, though it is not necessary to show this method will work with certainty at this time.").

Plaintiffs propose measuring damages as the out-of-pocket repair costs for the air conditioning units that actually failed or will fail.[11] Typically, here is where the Court would

---

[11] Specifically, Frank Bernatowicz submitted a declaration to rebut Defendant's damages expert. Bernatowicz Decl. (Dkt. 172-2). Mr. Bernatowicz proposes two methodologies for determining class-wide damages: (1) out-of-pocket repair costs incurred or to be incurred by class members and (2) diminution in value of the AC units based on defects at the time of purchase. *Id.* ¶ 27. Plaintiffs themselves reject the second theory, Sur-Sur-Reply at 2 ("Plaintiffs do not allege they should

summarize the "out-of-pocket repairs" theory, yet the simplicity of the title is somewhat misleading. The Court has difficulty assessing the expert Mr. Bernatowicz's, or perhaps Plaintiffs', theory. From the Plaintiffs' proposed class definition, it appears that the Plaintiffs consider *all* of Goodman's products containing copper coils to be defective. Yet, the damages model purports to measure only out-of-pocket repair costs that would compensate only those class members whose unit actually failed, rather than all class members who purchased an allegedly defective product. In that case, Plaintiffs' proposed class definition would again appear to be unduly broad, encompassing many who will never suffer any loss as determined by out-of-pocket costs. Alternately, if the theory somehow proposes to compensate those who purchased an air conditioning unit that continues to function perfectly, it is unclear how the damages model is compensating them for any purported loss.

Of course, the Court recognizes that "[t]he *amount* of damages is invariably an individual question and does not defeat class action treatment." *Blackie*, 524 F.2d at 905 (emphasis added). Nevertheless, here, individual issues would predominate, because each failure would require proof that it arose from the defect alleged, reinserting the issue of causation previously avoided by the consumer claims, which is an issue that does not appear as if it could be resolved feasibly and efficiently. *See Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) ("removal notice thus demonstrates that damages could feasibly and efficiently be calculated once the common liability questions are adjudicated"). Furthermore, this method does not appear to address Plaintiffs' own theory of the case, that Goodman manufactured and sold defective copper coils, knowing they were prone to prematurely leak refrigerant, and failed to disclose this information to Plaintiffs and other class members. Plaintiffs' damages theory does not touch on the economic impact of any alleged misrepresentations leading to purchases of air conditioners containing the defective product where the product does not fail. Finally, Plaintiff's damages theory does not purport to be

---

have paid less for Goodman's defective air conditioner units"), and instead commit themselves to Mr. Bernatowicz's "out-of-pocket" repair theory. *Id.*

restitutionary, so as to be a proper measure of damages under the UCL or FAL. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003). Plaintiffs' theory of damages therefore fails legally and also presents individual causation issues subject to individualized proof.

### 2.     Conclusion Regarding Rule 23(b)(3)

In sum, the Court concludes that the predominance requirement of Rule 23(b) has not been satisfied, and individual issues predominate over class-wide ones.

The second prong of the analysis under Rule 23(b)(3) requires a finding that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Having found that Plaintiffs have failed to establish the predominance prong of the inquiry, the Court will not address the superiority prong.

### B.   Rule 23(b)(2)

Plaintiffs also argue that the class should be certified pursuant to Rule 23(b)(2). Rule 23(b)(2) applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Class certification under Rule 23(b) (2) is appropriate only where the primary relief sought is declaratory or injunctive." *Ellis*, 657 F.3d at 986. For classes certified pursuant to Rule 23(b)(2), monetary damages must be "merely incidental to the primary claim" for injunctive relief. *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1195 (9th Cir. 2001). Individualized monetary claims belong under Rule 23(b)(3), "with its procedural protections of predominance, superiority, mandatory notice, and the right to opt out." *Wal-Mart*, 131 S.Ct. at 2545.

Plaintiffs purportedly seeks certification under Rule 23(b)(2) for declaratory and injunctive relief. However, the request seems to be disguising a true request for future monetary payouts in the event of future product failures. Although the injunctive relief would ostensibly declare the product "defective," only those who eventually experience product failures as a result of the alleged defect would be entitled to any concrete recovery. "While this relief is characterized as an injunction, the end result would be individualized monetary payments to

qualifying class members." *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 560 (C.D. Cal. 2012). Such an outcome is impermissible under Rule 23(b)(2), and therefore the request for class certification under Rule 23(b)(2) must also be DENIED.

### V.      Disposition

For the foregoing reasons, the Court:

(1) DENIES Plaintiffs' Motion for Class Certification, and

(2)  DENIES AS MOOT Defendants' Motion to Exclude.

_____

DAVID O. CARTER

UNITED STATES DISTRICT JUDGE

DATED:  August 20, 2015